**Joseph G. Sansone**
**Charles D. Riely**
**Mark S. Germann**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-0586 (Germann)**
**Email: GermannM@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>               **Plaintiff,**<br><br>     **- against -**<br><br>**STEVEN V. MCCLATCHEY and**<br>**GARY J. PUSEY,**<br><br>            **Defendants.** | **No. 16 Civ. _____**<br><br>**COMPLAINT AND**<br>**JURY DEMAND** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants Steven V. McClatchey ("McClatchey") and Gary J. Pusey ("Pusey") (collectively, "Defendants"), alleges as follows:

### SUMMARY OF ALLEGATIONS

1. This case involves an insider trading scheme carried out by McClatchey and Pusey. McClatchey had access to material, nonpublic information concerning impending merger and acquisition ("M&A") transactions through his employment at a major investment bank (hereafter, "Bank A"). Throughout 2014 and 2015, McClatchey tipped his employer's highly-confidential information concerning yet-to-be-announced M&A transactions to Pusey,

McClatchey's plumber and close friend.  Pusey, in turn, used this information to execute trades in advance of the announcement of at least ten M&A deals and reaped approximately $76,000 of illegal profits.

2.     Through his work at Bank A, McClatchey obtained confidential information concerning M&A deals that his employer was pursuing on behalf of its clients.  McClatchey's responsibilities included collecting up-to-date information on potential M&A transactions involving Bank A's clients and summarizing this information in PowerPoint presentations circulated to senior members of Bank A's investment banking division.

3.     Bank A and its clients considered this information about potential M&A transactions to be highly confidential.  Bank A maintained firm-wide policies that required employees to maintain the confidentiality of client-related information and that prohibited trading on and tipping of material, nonpublic information acquired from the bank.  Bank A emphasized the importance of these policies to employees within its investment banking division given the sensitive nature of the group's work, and McClatchey received training concerning Bank A's insider trading policies.  McClatchey owed Bank A and its clients a duty to maintain in confidence the M&A transaction information he obtained during the course of his employment.

4.     In breach of these duties, McClatchey tipped Pusey.  Before each of the ten impending deals was announced to the public, McClatchey provided the name of the target company to Pusey and Pusey then executed profitable trades.  In exchange for these tips, Pusey made cash payments totaling thousands of dollars to McClatchey by occasionally placing cash in McClatchey's gym bag or handing the cash directly to McClatchey in McClatchey's garage.  In addition, in or about June 2014, after their insider trading scheme began, Pusey provided McClatchey with free services to remodel McClatchey's bathroom.

5.      In carrying out the insider trading scheme, McClatchey knowingly or recklessly disclosed material, nonpublic information to Pusey for use in trading activities.  Pusey, for his part, knew, recklessly disregarded, or should have known that McClatchey was breaching his obligations to maintain the confidentiality of Bank A's and its clients' information by disclosing it to Pusey, and, further, Pusey knowingly or recklessly traded on the basis of the material, nonpublic information that McClatchey tipped him.

## SECURITIES LAW VIOLATIONS

6.      By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly or in concert, have engaged in acts, practices, schemes, and courses of business that violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].  Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking to restrain and enjoin permanently Defendants from engaging in the acts, practices, and courses of business alleged herein.

8.      In addition to seeking injunctive relief, the Commission seeks a final judgment: (i) ordering Defendants to disgorge their ill-gotten gains with prejudgment interest thereon pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (ii) ordering

Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and (iii) granting such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u-1 & 78aa].

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, or of the mails and wires, in connection with the transactions, acts, practices, and courses of business alleged herein.  A substantial part of the events comprising Defendants' unlawful activities and giving rise to the Commission's claims occurred in this District:  (a) McClatchey worked at Bank A's office within this District and misappropriated material, nonpublic information about at least ten M&A transactions while working there; (b) Pusey undertook insider trading in securities listed on the New York Stock Exchange ("NYSE") and the NASDAQ stock exchange, which are both headquartered in this District; and (c) several witnesses involved in the events comprising and relating to Defendants' unlawful activities reside or conducted business in this District.

## DEFENDANTS

11.     **McClatchey**, age 58, is a resident of Freeport, New York.  McClatchey worked in Bank A's investment banking division from 2008 to late 2015.  From 2014 through late 2015, McClatchey was employed as a director and reported to the global head of M&A at Bank A.

12.     **Pusey**, age 47, is a resident of Mineola, New York.  Pusey is a plumber and works at a small business in Mineola that provides plumbing and heating services.

## BANK A AND THE TEN COMPANIES

13.     **Bank A**, a broker-dealer registered under the Exchange Act, is a Connecticut corporation with its headquarters in London, England and its principal United States office in New York, New York.  Bank A's investment banking division provides advisory, financing, and risk management services to large companies, institutions, and government clients.

14.     During the relevant period, **Emulex Corporation ("Emulex")**, a U.S. company headquartered in Costa Mesa, California, was in the business of providing network connectivity and monitoring hardware and software solutions.  Emulex's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NYSE until May 5, 2015, when it was acquired via a tender offer by Avago Technologies Limited ("Avago") a semiconductor supplier headquarted in Singapore.  Bank A represented Avago in the transaction.

15.     During the relevant period, **Entropic Communications, Inc. ("Entropic")**, a U.S. company headquartered in San Diego, California, was in the business of providing semiconductor solutions for use in the home.  Entropic's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NYSE until April 30, 2015, when it was acquired by MaxLinear, Inc. ("MaxLinear"), a California-based provider of semiconductors for broadband communications.  Bank A represented Entropic in the transaction.

16.     During the relevant period, **Forest Oil Corp. ("Forest Oil")**, a U.S. company headquartered in Denver, Colorado, was in the business of exploring and producing oil, natural gas, and variants of natural gas liquids.  Forest Oil's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NYSE until

December 16, 2014, when it was acquired by Sabine Oil & Gas LLC ("Sabine Oil"), an oil and gas producer headquartered in Texas.  Bank A represented Sabine Oil in the transaction.

17.     During the relevant period, **Measurement Specialties, Inc. ("Measurement Specialties")**, a U.S. company headquartered in Hampton, Virginia, was in the business of designing and manufacturing sensors and sensor-based systems.  Measurement Specialties's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ until October 9, 2014, when it was acquired by TE Connectivity Ltd. ("TE Connectivity"), a Switzerland-based provider of connectivity solutions. Bank A advised Measurement Specialties in the transaction.

18.     During the relevant period, **Omnicare, Inc. ("Omnicare")**, a U.S. company headquartered in Cincinnati, Ohio, was in the business of providing pharmacy and related services to elder care and other specialized health care businesses.  Omnicare's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NYSE until August 18, 2015, when it was acquired by CVS Health Corporation ("CVS"), a pharmacy retailer headquarted in Rhode Island.  Bank A advised CVS in the transaction.

19.     During the relevant period, **Pepco Holdings, Inc. ("Pepco")**, a U.S. company headquartered in Washington, DC, was in the business of providing energy and energy-related products to residential and business customers.  Pepco's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NYSE until March 23, 2016, when it was acquired by Exelon Corporation ("Exelon"), a national energy provider headquarted in Illinois.  Bank A advised Exelon in the transaction.

20.     **Petsmart, Inc. ("Petsmart")**, a U.S. company headquartered in Phoenix, Arizona, is in the business of selling pet supplies and services.  Petsmart's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ until March 11, 2015, when it was taken private by BC Partners Limited ("BC Partners"), a private equity firm headquarted in London, England.  Bank A advised BC Partners in the transaction.

21.     During the relevant period, **Questcor Pharmaceuticals, Inc. ("Questcor")**, a U.S. company headquartered in Anaheim, California, was a biopharmaceutical company focused on treating autoimmune and inflammatory disorders.  Questcor's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ until August 14, 2014, when it was acquired by Mallinckrodt PLC ("Mallinckrodt"), a pharmaceutical company headquarted in the United Kingdom.  Bank A advised Mallinckrodt in the transaction.

22.     During the relevant period, **TECO Energy, Inc. ("TECO")**, a U.S. company headquartered in Tampa, Florida, specialized in providing utilities to customers in Florida and New Mexico.  TECO's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is listed on the NYSE.  In September 2015, TECO agreed to be acquired by Emera, Inc. ("Emera"), an energy company headquarted in Nova Scotia.  Bank A advised a company that had also explored the possibility of acquiring TECO.

23.     During the relevant period, **Zygo Corporation ("Zygo")**, a U.S. company headquartered in Middlefield, Connecticut, specialized in optical systems and equipment for use in applications such as optical metrology.  Zygo's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ

until June 20, 2014, when it was acquired by AMETEK, Inc. ("AMETEK"), an electronic

instrument manufacturer headquarted in Pennsylvania.  Bank A advised Zygo in the transaction.

## FACTS

### McClatchey's Close Personal Relationship with Pusey

24.     In or about 2011 or 2012, Pusey met McClatchey on the dock at the Yachtsmen's

Cove marina in Freeport, New York.  The two owned fishing boats of the same make and model

and kept them in adjacent slips at the marina.  Shortly after meeting, Pusey and McClatchey

became very close friends.

25.     Since at least 2013, McClatchey and Pusey saw each other regularly on the

weekend.  During the boating season, McClatchey and Pusey went fishing or boating together

almost every Saturday.  During the colder months, they also spent many Saturdays together,

generally playing pool or watching sports in McClatchey's renovated garage.

26.     Beginning in at least 2013, Pusey and McClatchey communicated frequently by

phone.  From 2013 through 2015, Pusey and McClatchey contacted each other at least 500 times

by telephone or text message.

27.     By at least 2013, Pusey knew that McClatchey worked in the investment banking

division at Bank A.

### McClatchey's Access to Deal Information at Investment Bank A and His Obligation to Maintain Confidentiality

28.     McClatchy had regular access to material, nonpublic information as part of his

employment at Bank A.  Bank A is a global bank with over 130,000 employees in 40 countries.

A major component of Bank A's business is its large investment banking division.  Bank A has

advised many publicly traded companies on complex transactions, including M&A deals.

29.     From 2008 through late 2015, McClatchey served as a director in the investment banking division of Bank A, concentrating on M&A work.

30.     Since at least 2013, McClatchey had responsibility for tracking all potential M&A deals in which Bank A was involved and collecting up-to-date information on those deals.  In connection with this responsibility, McClatchey received conflict checks concerning potential clients, engagement letters, and notices of when Bank A's Fairness Opinion Committee met to discuss the valuation of the targets in M&A transactions.

31.     In order to track the impending M&A deals, McClatchey obtained highly-confidential, up-to-date information on the status of the deals from the Bank A bankers working on those deals.  McClatchey compiled this information in a weekly PowerPoint presentation that was circulated to certain senior members of Bank A's investment banking division.  Each PowerPoint presentation, entitled "M&A Global Weekly Business Update" (hereinafter "M&A Weekly Update"), contained information on M&A transactions likely to be announced the following week, in the near future, or that were otherwise in progress.  The M&A Weekly Update often included the name of the Bank A client, a description of the transactions (including the counterparty), the size of the potential deal, Bank A's likely fee, and other notes about the status of each potential deal.

32.     Through his employment at Bank A, McClatchey obtained material, nonpublic information about the potential acquisition of ten companies—Emulex, Entropic, Forest Oil, Measurement Specialties, Omnicare, Pepco, Petco, Questcor, TECO, and Zygo (collectively, the "Companies")—that Pusey traded in advance of the acquisitions being announced to the public.

33.     At all relevant times, Bank A maintained firmwide policies that required employees to maintain the confidentiality of client-related information and that prohibited insider

trading and tipping of material, nonpublic information acquired from the bank.  At all relevant times, Bank A also required employees, including McClatchey, to read, understand, and abide by those policies.  In addition, McClatchey completed Bank A's required compliance training, which included modules on insider trading, during the relevant period.

34.     McClatchey owed a fiduciary duty of confidentiality, or an obligation arising from a similar relationship of trust or confidence, to Bank A, its clients, and/or its clients' shareholders to keep material, nonpublic information about the ten Companies' transactions— including their existence and nature—confidential.

**Overview of Insider Trading Scheme**

35.     Despite McClatchey's clear duty to maintain the confidentiality of the material, nonpublic information he received from Bank A, he repeatedly tipped such information to Pusey. Starting in early 2014, McClatchey began providing Pusey with tips on upcoming M&A deals in which Bank A was involved.  Before McClatchey started tipping Pusey about Bank A's M&A deals, McClatchey told Pusey not to tell anyone about the tips McCaltchey would provide, not even Pusey's family.  Pusey agreed and, during the relevant time period, never told anyone that McClatchey provided him with tips about upcoming M&A deals.

36.     Generally, McClatchey first learned of the potential M&A information that he tipped to Pusey when he received a conflict check email referencing a potential acquisition target.  McClatchey later learned additional material, nonpublic information about the impending deals through the course of his employment.  After learning of the potential M&A deals, McClatchey provided Pusey with the names of the targets of the impending acquisitions and communicated that Pusey should buy each company's securities, indicating that something good would happen to each company.

37.     Using the tips provided by McClatchey, Pusey traded in advance of at least ten deals and reaped over $76,000 in illicit profits.  After the initial profitable trades, Pusey began paying McClatchey for the information.  In several instances, Pusey paid McClatchey cash by placing hundreds of dollars at a time in McClatchey's gym bag, usually at the marina where they kept their boats, or sometimes handing the cash directly to McClatchey in McClatchey's garage. In another instance, Pusey provided McClatchey with free services to remodel McClatchey's bathroom.

38.     Pusey and McClatchey attempted to conceal their illegal insider trading scheme by avoiding any written communications about McClatchey's stock tips.  Although the two frequently communicated by text, they were careful not to exchange text messages that referenced the insider trading scheme.

39.     McClatchey knew that the information he had collected about potential M&A transactions between Bank A's clients and the counterparties to the deals was material, nonpublic information.  McClatchey also understood that if the transactions were consummated, the stock price of the target would likely increase.  On each occasion described below, McClatchey intentionally provided his friend Pusey with material, nonpublic information about a potential M&A deal.

40.     Defendants knew, recklessly disregarded, or should have known that Bank A's information about the ten Companies' impending transactions was material and nonpublic.

41.     Defendants knew, recklessly disregarded, or should have known that McClatchey had a duty to keep information about the ten companies' impending transactions confidential and to refrain from trading on or tipping such information.

42.     Defendants misused Bank A's material, nonpublic client information for their personal benefit.  Each time McClatchey tipped Pusey, McClatchey breached his fiduciary duty of confidentiality, or a duty of trust or confidence arising from a similar relationship, to Bank A, its clients, and/or its clients' shareholders.  Defendants knew, recklessly disregarded, or should have known that McClatchey breached his fiduciary duty of confidentiality, or a duty of trust or confidence arising from a similar relationship, to Bank A, its clients, and/or its clients' shareholders.

**McClatchey's Access to Information Concerning Ten**
**Impending Acquisitions, and Pusey's Profitable Trades**

43.     As detailed below, in ten separate instances, McClatchey obtained information concerning impending M&A deals and Pusey made profitable trades in advance of the announcement of those deals to the public.

*Insider Trading in Forest Oil*

44.     Through his work, McClatchey obtained material, nonpublic information concerning Forest Oil.  On or about February 10, 2014, McClatchey received a conflict check email discussing a proposed merger between Sabine Oil & Gas and Forest Oil.  After obtaining additional information from his colleagues, McClatchey helped draft Bank A's M&A Weekly Update for March 21, 2014, which listed the potential announcement of Sabine Oil's $1.5 billion bid to acquire Forest Oil.  The following week, on March 28, 2014, McClatchey moved the Forest Oil and Sabine Oil deal to the "Expected Next Week" page of the M&A Weekly Update.

45.     In late March 2014, McClatchey tipped Pusey to buy Forest Oil stock.

46.     On Monday morning, March 31, 2014, Pusey bought 12,000 shares of Forest Oil stock at $1.91 per share.  Before then, Pusey had never purchased Forest Oil stock.

47.     On the morning of May 6, 2014, before the U.S. securities markets opened, Forest Oil and Sabine Oil announced the signing of a definitive merger agreement.  Forest Oil's stock price closed at $2.03 per share, up approximately 13.4% from the prior day's closing price.

48.     Pusey sold 10,000 shares of Forest Oil stock at $2.31 per share on May 6, 2014, realizing a profit of $4,069.  As of the close of trading that day, Pusey also generated unrealized trading profits of $240 on the 2,000 shares that remained in his brokerage account.

*Insider Trading in Questcor*

49.     Through his work, McClatchey obtained material, nonpublic information concerning Questcor.  On January 31, 2014, McClatchey received a conflict check email indicating that Bank A client Mallinckrodt, LLC was exploring a potential merger with Questcor.  Two months later, after obtaining information from his colleagues, McClatchey helped draft Bank A's M&A Weekly Update for March 28, 2014.  This document referenced the potential announcement of Mallinckrodt's $6 billion acquisition of Questcor, noting that the Fairness Opinion Committee was scheduled to meet on April 3, 2014 and that the deal was tracking toward an announcement date of April 7, 2014.

50.     On or before April 4, 2014, McClatchey tipped Pusey to buy Questcor stock.  On Friday, April 4, 2014, Pusey bought 425 shares of Questcor stock at a price of $70.90 per share.  Before then, Pusey had never purchased Questcor stock.

51.     On the morning of April 7, 2014, before the U.S. securities markets opened, Mallinckrodt and Questcor announced that Mallinckrodt would acquire Questcor.  That afternoon, Questcor's share price closed at $80.58, up approximately 18.7% from the prior day's closing price.

52.     On April 10, 2014, Pusey sold 375 shares of Questcor stock for $80 per share.
Overall, Pusey reaped realized gains of $3,622 from the 375 Questcor shares he sold and
unrealized gains of $483 from the 50 Questcor shares he purchased but held.

*Insider Trading in Zygo*

53.     Through his work, McClatchey obtained material, nonpublic information
concerning Zygo.  On, September 13, 2013, McClatchey received a conflict check email listing
Zygo as a client.  After obtaining information from his colleagues, McClatchey helped draft
Bank A's M&A Weekly Update for March 28, 2014, which identified the upcoming sale of Zygo
for $400 million with a "tentative announcement date set for April 11."  On April 8, 2014,
McClatchey received an email from a Bank A employee indicating that the Zygo M&A
transaction would likely be announced on Friday, April 11, 2014.

54.     On or before April 10, 2014, McClatchey tipped Pusey to buy Zygo stock.  On
Thursday, April 10, 2014, Pusey bought 700 shares of Zygo stock for $14.69 per share.  Before
then, Pusey had never purchased Zygo stock.

55.     On the morning of April 11, 2014, before the U.S. securities markets opened,
Zygo announced it would be acquired by AMETEK for $19.25 per share.  Later that day, Zygo's
share price closed at $19.43 per share, up approximately 32.4% from the prior day's closing
price.

56.     As a result the illegal Zygo trades he placed based on McClatchey's tip, Pusey
generated unrealized profits of $3,318.

*Insider Trading in Pepco*

57.     Through his work, McClatchey obtained material, nonpublic information
concerning Pepco.  On February 10, 2014, McClatchey received a conflict check email

indicating that Bank A was advising Exelon about a possible merger transaction. On April 24, 2014, after obtaining information from his colleagues, McClatchey sent an email indicating that Exelon's final bid to acquire Pepco was due the next day and that the parties hoped to announce a deal during the week of May 5. On April 25, 2014, McClatchey helped draft Bank A's M&A Weekly Update, which identified the Exelon Corporation acquisition of Pepco as a potential announcement, and included information similar to his April 24 email.

58.     On or before April 28, 2014, McClatchey tipped Pusey to buy Pepco stock. On April 28, 2014, Pusey purchased 1,900 shares of Pepco stock at a price of $21.92 per share. Before then, Pusey had never purchased Pepco stock.

59.     On the morning of April 30, 2014, before the U.S. securities markets opened, Exelon announced it would acquire Pepco and the share price of Pepco stock rose approximately 17.4% to close at $26.76 per share.

60.     As a result of the illegal Pepco trades that he placed based on McClatchey's tip, Pusey generated unrealized trading profits of $9,196.

*Insider Trading in Measurement Specialties*

61.     Through his work, McClatchey obtained material, nonpublic information concerning Measurement Specialties. After obtaining information from his colleagues, McClatchey helped draft Bank A's M&A Weekly Update for April 25, 2014, which identified a potential acquisition of Measurement Specialties by a "strategic buyer" and indicated that the parties were "making progress" and "targeting [a] Q2 announcement date." After obtaining additional information from his colleagues, McClatchey helped draft Bank A's M&A Weekly Update for May 16, 2014, which indicated that TE Connectivity was conducting due diligence of Measurement Specialties and that the parties hoped to sign an agreement by mid-June.

62.     On or before May 30, 2014, McClatchey tipped Pusey to buy Measurement Specialties stock.  On Friday, May 30, 2014, Pusey bought 200 shares of Measurement Specialties stock at approximately $64.06 per share.  Before then, Pusey had never purchased Measurement Specialties stock.

63.     After the market close on June 18, 2014, TE Connectivity announced that it would acquire Measurement Specialties.  By market close the following day, Measurement Specialties stock price had risen to $86.38 per share, an increase of approximately 10.7% over the stock's closing price on June 18.

64.     As a result of the illegal Measurement Specialties trades that he placed based on McClatchey's tip, Pusey generated unrealized profits of $4,465.

*Insider Trading in Entropic*

65.     Through his work, McClatchey obtained material, nonpublic information concerning Entropic.  After obtaining information from his colleagues, McClatchey helped draft Bank A's M&A Weekly Update for August 29, 2014, which listed a potential announcement concerning the sale of Entropic, noting that the Fairness Opinion Committee was scheduled to meet to discuss the valuation of Entropic on September 2, 2014, and that MaxLinear was in the "front of the pack" in its pursuit to acquire Entropic.

66.     On or before September 4, 2014, McClatchey tipped Pusey to buy Entropic stock. On Thursday, September 4, 2014, Pusey bought 2,600 shares of Entropic stock for approximately $2.57 per share.  Before then, Pusey had never purchased Entropic stock.  On Friday, September 5, 2014, Pusey purchased an additional 17,400 shares of Entropic stock for approximately $2.64 per share.

67.     Before the market opened on September 16, 2014, Entropic announced that it had retained Bank A to explore strategic alternatives.  That day, Entropic's stock price rose and closed at $2.94 per share, an increase of approximately 7.3% over the prior day's closing price.

68.     As a result of the illegal Entropic trades that he placed based on McClathey's tip, Pusey generated unrealized profits of $6,879 in September 2014.  Pusey sold all 20,000 shares of Entropic stock in October 2014.

69.     On or about January 9, 2015, McClatchey received a conflict check email indicating that MaxLinear and another party were "potential buyers of Entropic."

70.     After obtaining additional information from his colleagues, McClatchey helped draft the M&A Weekly Update for January 23, 2015, which listed a potential announcement concerning the sale of Entropic to MaxLinear and stated that the Fairness Opinion Committee was scheduled to review the transaction on January 29, 2015, and estimated that the deal papers would be signed on or around February 9, 2015.

71.     On or before January 26, 2016, McClatchey tipped Pusey to buy Entropic stock.  On January 26, 2016, Pusey purchased 10,000 shares of Entropic stock at a price of approximately $2.63 per share.

72.     Before the market opened on February 3, 2015, Entropic announced that it would be acquired by MaxLinear.  That same day, Entropic's stock price rose and closed at $3.06 per share, an increase of 13.3% compared to the previous day's closing price.

73.     As a result of the illegal Entropic trades he placed on January 26, 2016, based on McClatchey's tip, Pusey generated unrealized profits of $4,300.

*Insider Trading in PetSmart*

74.     Through his work, McClatchey obtained material, nonpublic information concerning PetSmart.  On November 7, 2014, McClatchey received a conflict check email indicating Bank A's client BC Partners was pursuing a potential $8.8 billion acquisition of PetSmart.

75.     On or before November 18, 2014, McClatchey tipped Pusey to buy PetSmart stock.  On November 18, 2014, Pusey purchased 800 shares of PetSmart stock at a price of approximately $73.41 per share.  Before then, Pusey had never purchased PetSmart stock.

76.     After the markets had closed on December 14, 2014, PetSmart announced it would be acquired by a consortium led by BC Partners.  By market close on December 15, 2014, PetSmart's stock price had risen to $80.97 per share, an increase of approximately 4.2% over the stock's closing price on December 13, 2014.

77.     As a result of the illegal PetSmart trades that he placed based on McClatchey's tip, Pusey generated unrealized profits of $6,048.

*Insider Trading in Emulex*

78.     Through his work, McClatchey obtained material, nonpublic information concerning Emulex.  On January 20, 2015, McClatchey received a conflict check email indicating Bank A was representing Avago in connection with a potential acquisition of an unknown target.  On February 17, 2015, McClatchey sent an email to another Bank A employee inquiring about the date of the announcement of Avago's potential acquisition of Emulex. McClatchey's colleague responded that the plan was to announce the deal on February 25 after market close.  After obtaining information from his colleagues, McClatchey helped draft Bank

A's M&A Weekly Update for February 20, 2015, which listed Avago's acquisition of Emulex as "Expected Next Week."

79.     On or before February 23, 2015, McClatchey tipped Pusey to buy Emulex stock. On February 23, 2015, Pusey purchased 10,000 shares of Emulex stock for approximately $6.23 per share.  Pusey had never before purchased Emulex stock.  On February 24, 2015, Pusey purchased an additional 3,000 shares of Emulex stock in the same account for $6.33 per share.

80.     When Pusey traded in Emulex, on February 23, 2015, substantial steps had been taken by Avago to commence a tender offer for the shares of Emulex stock, including but not limited to:  (1) both Avago and Emulex had engaged attorneys and financial advisors to advise them on the proposed transaction; (2) Avago had made an offer to purchase Emulex at a price of $8 per share; (3) Emulex had provided due diligence information to Avago; and (4) the parties had exchanged draft merger agreements.

81.     On February 25, 2015, after the market had closed, Avago announced it would commence a tender offer to acquire all of the outstanding shares of Emulex common stock for $8 per share or approximately $606 million.  By market close on February 26, 2015, Emulex's stock price had risen to $7.93 per share, an increase of approximately 24.79% over the prior trading day's closing price.

82.     As a result of the illegal Emulex trades that he placed based on McClatchey's tip, Pusey generated an unrealized gain of $21,800.

*Insider Trading in Omnicare*

83.     Through his work, McClatchey obtained material, nonpublic information concerning Omnicare.  On March 5, 2015, McClatchey received a conflict check email stating that "CVS is looking to potentially acquire Omnicare."  After obtaining information from his

colleagues, McClatchey helped draft Bank A's M&A Weekly Update for May 8, 2015, which indicated the potential announcement of a transaction involving Omnicare and noting that the due date for suitors to make their first round bids to acquire the company was May 8.

84.     On or before May 18, 2015, McClatchey tipped Pusey to buy Omnicare stock. On May 18, 2015, Pusey purchased 470 shares of Omincare stock for $92.67 per share.  Before then, Pusey had never purchased Omnicare stock.

85.     On May 21, 2015, before the opening of the market, Ominicare announced it was being acquired by CVS for $98 per share.  At the market close, Omnicare's stock price had risen to $96.26 per share, an increase of approximately 1.7% over the stock's closing price on the prior trading day.  The volume of Omnicare trading on May 21, 2015 (29.92 million shares) was 1680% higher than the average volume over the five previous trading days (1.78 million shares).

86.     As a result of the illegal Omnicare trades he placed based on McClatchey's tip, Pusey generated an unrealized gain of $1,689.

*Insider Trading in TECO*

87.     Through his work, McClatchey obtained material, nonpublic information concerning TECO.  On June 18, 2015, McClatchey received a conflict check email for a Bank A client that was a potential suitor to acquire TECO.  After obtaining information from his colleagues, McClatchey helped draft Bank A's M&A Weekly Update for August 21, 2015, which indicated that a client of Bank A was pursuing a potential acquisition of TECO and noting that final bids to acquire TECO were due on August 27, 2015.

88.     On or before August 25, 2015, McClatchey tipped Pusey to buy TECO stock.  On August 25, 2015, Pusey purchased 2,000 shares of TECO stock at a price of approximately $21.25 per share.  Before then, Pusey had never purchased TECO stock.

89.     On September 4, 2015, after the market's close, TECO announced that it had agreed to be purchased by Emera for $10.4 billion.  By market close the next trading day, September 8, TECO's stock price had risen to $26.34 per share, an increase of approximately 25% over the prior trading day's closing price.

90.     As a result of the illegal TECO trades that he placed based on McClatchey's tip, Pusey generated unrealized profits of $10,179.

*Total Profits from Trading in Ten Companies*

91.     Between March 2014 and September 2015, McClatchey tipped Pusey with material, nonpublic information concerning the impending acquisitions of at least ten different companies.  Based on these illicit tips, Pusey made realized and unrealized profits totaling of over $76,000.  Pusey paid a portion of these profits to McClatchey in multiple cash payments.

**CLAIM I**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against all Defendants)**

92.     The Commission realleges and incorporates by reference paragraphs 1 through 91, as though fully set forth herein.

93.     The information that McClatchey tipped to Pusey was, in each case, material and nonpublic.  In addition, the information was, in each case, considered confidential by Bank A, the company from which McClatchey obtained the information, and Bank A had policies protecting its confidential information and the confidential information of its clients.

94.     McClatchey learned the material, nonpublic information about the Companies that he conveyed to Pusey as a result of his employment in Bank A's investment banking division, and McClatchey knew, recklessly disregarded, or should have known that he owed a fiduciary duty, or obligation arising from a similar relationship of trust or confidence, to Bank A, Bank

A's clients, and/or its clients' shareholders to keep the information confidential and refrain from tipping the information to others.

95.     McClatchey tipped material, nonpublic information to Pusey in breach of the fiduciary duty or obligation arising from a similar relationship of trust or confidence that McClatchey owed Bank A, Bank A's clients, and/or its clients' shareholders and did so with the expectation of receiving a personal benefit.  Pusey provided McClatchey with a personal benefit in consideration for McClatchey providing Pusey with the nonpublic information.

96.     Pusey knew, recklessly disregarded, or should have known that McClatchey owed a fiduciary duty, or obligation arising from a similar relationship of trust or confidence, to keep the information confidential.

97.     Pusey knew, recklessly disregarded, or should have known that the material information that he received from McClatchey was disclosed or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence.

98.     Pusey traded the Companies' securities while in possession of the material, nonpublic Bank A information that he received from McClatchey.

99.     By virtue of the foregoing, McClatchey and Pusey, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

100.     By virtue of the foregoing, McClatchey and Pusey, directly or indirectly, violated, and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## CLAIM II
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder
### (Against all Defendants)

101.     The Commission realleges and incorporates by reference paragraphs 1 through 100, as though fully set forth herein.

102.     McClatchey obtained material, nonpublic information from his employer, Bank A, about impending transactions involving its client Avago.

103.     Defendants knew or had reason to know that McClatchey had obtained information about this transaction directly from Bank A, and that Bank A was working on the transaction on behalf of one of the parties to the transaction

104.     Defendants knew or had reason to know that Bank A's information about the impending tender offer for Emulex was nonpublic.

105.     After substantial steps had been taken to commence a tender offer for Emulex's shares and before the tender offer had been publicly announced, McClatchey tipped Pusey to trade in the securities of Emulex under circumstances in which it was reasonably foreseeable that Pusey would purchase and sell Emulex securities.

106.     By reason of the conduct described above, McClatchey and Pusey, directly or indirectly, violated, and, unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining defendants McClatchey and Pusey from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3] pursuant to Section 21(d)(1) of the Exchange Act [14 U.S.C. § 78u(d)(1)].

### II.

Ordering defendants McClatchey and Pusey, on a joint and several basis, to disgorge, with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as a result of the conduct alleged in this Complaint.

### III.

Ordering defendants McClatchey and Pusey to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

### IV.

Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: May 31, 2016
       New York, New York

By: *Joseph G. Sansone*
       Joseph G. Sansone
       Charles D. Riely
       Mark S. Germann
       SECURITIES AND EXCHANGE COMMISSION
       200 Vesey Street, Suite 400
       New York, NY 10281-1022
       (212) 336-0586 (Germann)
       E-mail: GermannM@sec.gov